## Spencer *et al. versus* Darlington.

1. A lease was for ten years with a stipulation that the improvements erected might be removed at the end of the term. A brick malt-house was erected. The malt-house was personal property liable to be distrained for rent.

2. The term could not be sold under a distress for rent.

3. Bidders at a sale under a distress agreed that one should buy and sell to the other at the price at which he should buy it, after the sale the constable gave a receipt for the purchase-money of "a lease" and the receiver of the tenant, an insolvent, in consideration of the purchase-money beyond the

[Spencer v. Darlington.]

rent and costs conveyed all " his interest in the lease" to the purchaser at the sale. *Held*, that this conveyance did not affect the contract between the two bidders.

4. The lease stipulated that a transfer of the lease without the written consent of the lessors should be a forfeiture. The receiver of the lessee could not transfer it without the written assent of the lessor.

October 16th 1873.   Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the District Court of *Allegheny county :* No. 102, to October and November Term 1873.

This was an action of assumpsit, brought July 24th 1872, by Harry Darlington against Joseph Spencer, James McKay, Robert Liddell and Robert Watson, trading as Spencer, McKay & Co.

The declaration in the first count averred that the defendants had sold to the plaintiff " certain leasehold premises," describing them, and a brick malt-house thereon, and agreed to deliver them on the 1st of July 1872, in consideration of which the plaintiff promised to pay them $1500 on that day.   He then tendered to them the $1500, but they would not receive the $1500 nor perform their agreement, by delivering the leasehold premises and the malt-house.

In the second count he averred that he agreed to purchase from the defendants for $1500 " the said leasehold premises and malthouse ;" the defendants to deliver them to him on the 1st of July 1872, and the plaintiff then to pay the purchase-money ; and that defendants refused to comply with their contract.

The plaintiff afterwards filed an additional count.   He averred that the defendants were the owners and possessed a brick malthouse, and had also the privilege of using and occupying a lot of ground on which the malt-house was erected, subject to the payment of a small rent to the owner of the lot; and in consideration that the plaintiff agreed to purchase from them the malt-house for $1500, to be paid on the 1st of July 1872, " with the privilege of using and occupying the same, &c., upon the aforesaid lot," they agreed to sell the plaintiff the said malt-house, &c., with the privilege, &c., and deliver him possession on the said 1st day of July 1872, the plaintiff becoming liable to the owner of the lot for the rent of the lot.   The plaintiff averred that, having made the contract with the defendants, he obtained from the owner of the lot the privilege of using it as appertenant to the malt-house for a small rent for a long time from July 1st 1872.   The plaintiff averred his readiness to perform his part of the contract and pay the $1500, which he tendered on the 1st of July 1872 ; but the defendants refused to perform their part of the contract and deliver the malt-house.

The lot on which the malt-house was erected belonged to Edward Schenley and wife.   On the 3d of March 1866, they leased it to William H. Garrard & Co. for ten years, at an annual rent of

[Spencer *v,* Darlington.]

$525, payable quarterly, with condition, amongst others, that if the lessees should transfer the lease without the written assent of the lessors, they should forfeit it and the improvements; and also, that the improvements erected by the lessee might be removed at the end of the lease, it being further agreed that the buildings and improvements, and other property on the premises, should be liable to " distraint and sale under warrant in like manner as personal property for rent."

Garrard & Co. became insolvent, and George N. Armstrong was appointed receiver of their estate. The rent being unpaid, the lessors made a distress, and, after the sale, executed a bill of sale as follows:—

"·Received, Pittsburg, July 20th 1871, of Messrs. Spencer, McKay & Co., $393.75 in full for rent to 1st July 1871, on the premises formerly leased by W. H. Garrard & Co., from E. W. H. & Mary E. Schenley, situate, &c., and $28.30 for costs of landlord's warrant, &c. The said lease and premises being sold by me this day by virtue of said warrant to said Spencer, McKay & Co., they being the highest and best bidders, for the sum of $1500; the balance, say $1077.95, has been paid over to G. N. Armstrong, receiver of the estate of W. H. Garrard & Co., by appointment of court.                    JOHN B. SARBER, Constable."

The assignee executed and delivered a bill of sale as follows:—

"Pittsburg, July 21st 1871.

" For and in consideration of the sum of $1077.95, I, George N. Armstrong, receiver of the firm of Wm. H. Garrard & Co., do hereby assign, &c., all my interest in the lease of a certain premises, situate, &c., together with the buildings and improvements thereon erected, to Spencer, McKay & Co., subject to taxes from the year A. D. 1871, and rent from July 1st 1871. The said property having been sold to said Spencer, McKay & Co. on the 20th day of July, A. D. 1871, by John B. Sarber, a constable, by virtue of a landlord's warrant, issued by E. W. H. and Mary E. Schenley, for non-payment of rent.

" GEO. N. ARMSTRONG,
" Receiver for W. H. Garrard & Co."

The purchase by the defendants under these bills of sale is what the plaintiff charged in his declaration they had contracted to sell to him.

The case was tried May 19th 1873, before Hampton, P. J.

The plaintiff testified that, in July 1871, he bought the malt-house from Mr. Watson, one of the partners, for $1500, to be delivered in July 1872. The defendants " bought the malt-house the same day I bought it from them at constable's sale. * * * It was sold for rent at constable's sale. The contract was partially

[Spencer v. Darlington.]

made before the sale. Mr. Watson came to me and wanted to know how much I would give for it. I told him I did not know. * * * Then he asked me if I would rent it to him if I bought it. I told him I would. Then he asked me what I would rent it to him for. I told him I did not know; I would see how much I could buy it for; I would have to have an interest that would pay me. That did not appear to be satisfactory to him. After a while he came back to me, and said if they bought it their firm only wanted to run it one season, and at the expiration of that season, he would deliver it to me at whatever price he would pay for it. The sale went on. The first bid was $600. I bid $1200, and they bid $1500. I think there was no bid between theirs and mine. * * * Mr. Watson's proposition was to deliver the malt-house to me at whatever price they paid for it at the end of that season. I did not bid any further than $1200, with the understanding that I would get it at the end of the year. They bid it in. He said they only wanted to run it one season, and would deliver it to me in July 1872. * * * In the month of April 1872, I was at Mr. White's office, * * * and Mr. Watson drove up and told me he wanted to see me. We went into Mr. White's office, taking Mr. White in along with us. He asked me if I intended to take that malt-house on the 1st of July. I told him certainly. He says, ' I will be ready to deliver it to you on the 1st of July.' Said I, ' On the price you paid for it?' He said, '' Yes,' and said he, ' I want John White, Jr., to be a witness.' * * * Then, on the 1st of July, I went to Mr. Watson's office, and took with me $1500 U. S. money to pay for the malt-house. He said he could not take the money. I asked him the reason—I told him I had called to pay for the malt-house; whether the price and time was not right. He said, ' Yes, sir, it is all right; but my partners will not let me deliver it to you.' Said I, ' Mr. Watson, give me a receipt for this money, and I will attend to your partners.' Said I, ' I am not a school-boy.' He said he could not do it. That is all the satisfaction I got. He made no objection as to the money or the amount. * * * I saw the owners of the ground on which this malt-house is built, prior to the sale of this malt-house. I had the privilege of retaining the malt-house on the ground where it stood. When I bought the malt-house it was to remain there; it was to be used where it is. * * * This malt-house was sold in 1871, on the premises. There were several persons there beside myself—Mr. Watson, Liddell, Rhodes, Galloway and Shell were there. I bought the malt-house that day from Mr. Watson; the constable announced what he had to sell; he said he had a malt-house seized as the property of Garrard to be sold for rent. The terms would be cash, and it would be sold to the highest bidder. He did not say it was real estate. He said he sold that malt-house. That is all I heard him

24 P. F. Smith—19

[Spencer *v.* Darlington.]

say about it. I bid $1200 that day on the malt-house—he had a paper there and read it; he did not say it was on a landlord's warrant; he said he sold this property for rent. I did not hear the constable say anything about selling a lease with the malt-house. I did not pay much attention to him, because I had found out all about it before from Mr. Schenley's agent. He said it had about three years to run, but I might have it ten years if I wanted it. It was on the morning of the sale that I learned this. He did not show me the lease at that time. * * * When I bid on it I was bidding on a malt-honse that I could let stand on that lease ten years if I wanted. I was bidding on it with the knowledge that it was on a leased property from Schenley to somebody else.

"I did not see a landlord's warrant. * * * I had some talk with Mr. Watson prior to the sale. He said he would let me have the malt-house on the 1st day of July 1872, at whatever price he paid for it. I believed him. * * * This was not over half an hour before the sale. My understanding with Mr. Watson was that if I bought it I was to lease it to him at a fair compensation. If he bought it, he was to sell it to me at what he bought it for. * * * There was nothing said about the price after the sale. He fixed the amount before the sale. After the sale he gave me a friendly tap and said, 'Now I will give you this next July.' * * * When I was bidding I knew I was buying a malt-house with the privilege of leaving it there or taking it away. I knew I could have it ten years if I wished it. I knew I was bidding on a malt-house and lease that had three years to run. I bought from Mr. Watson whatever they bought. He only agreed to give me the malt-house. I did not know anything about their lease. I bought all that they bought for $1500." * * *

John White testified: "Mr. Darlington and Mr. Watson had a conversation in my office in April or the beginning of May, in regard to this malt-house. They asked me to be a witness that Mr. Darlington would take this malt-house on the 1st of July; that he would give it to him at what it' cost, $1500. Darlington agreed to take the house, and Watson agreed to let him have the house; that was agreed on. I think Mr. Watson asked me to witness; they both asked me to witness it. There was no difficulty or dispute between them as to the bargain. I understood it perfectly, and they seemed to understand it; it was in April or May 1872. I understood it to be that Garrard malt-house down on Penn street. * * * There was something said about their having made a bargain about the matter before. They said they had been talking about this malt-house before, and now they had agreed to deliver it, and Darlington had agreed to take it. Mr. Watson spoke about building another malt-house; he said he wanted it understood that day whether Darlington would take this malt-house on the 1st of July, so that he would know what to do."

[Spencer *v.* Darlington.]

For defendant, John B. Sarber testified : " I was a constable in 1871 ; I had a landlord's warrant from the Schenley estate given to me by Mr. Torrence against the property of William H. Garrard. I sold the malt-house that day. It was on leased ground belonging to the Schenley estate I presume. I sold on that day a malt-house for $1500, belonging to Wm. H. Garrard. I never saw that paper from that day to this. The landlord's warrant was issued by Schenley against Garrard. Henry B. Hatch is the agent of the estate. I sold it on the premises. * * * I levied on the malt-house. I did not see the lease. I acted under the direction of Schenley's agent, Mr. Hatch. They directed me to sell the improvements that were on the ground, and that is what I sold. I did not sell any lease ; at least I may have stated that the lease had so long to run, but it was the improvements on the ground that I sold." * * *

Francis Torrence testified : " I have been acting as the agent of Mr. Schenley. This malt-house was sold under my direction. We always directed the constable to sell the improvements, with the understanding at the same time that the lease would be continued to the purchaser. That is the way we always instruct the constable to sell improvements, telling him at the same time that the lease would be continued. I cannot say particularly in this instance, but it has been done in all our cases of that kind."

*          *                    *          *

Robert Watson testified : * * * " I had no conversation with Mr. Darlington before the sale, only to bid good-morning to him and to ask him if he was going to buy a malt-house. He said he was. Said I, ' You will have to pay for it.' Robert Liddell bid the property in. I had a conversation with Darlington after the sale. * * * After the sale was over, Darlington came running across to me, a little excited, and said, ' You fellows has too much money for me. I do not want to buy a malt-house for that price. I did not want it for a year any way.' I said, ' If you do not want it for a year that puts another shape on the matter. We are talking of building another malt-house up at the other place, and I have no doubt you could get it at the end of a year if Spencer, McKay & Co. builds another one ; they do not want to haul malt two miles up there.' Well, he said he would like to have it at the end of the year. * * * I recollect of having a conversation with him at White's office, on Penn street. I was at White's, and Darlington came up along the street and stopped his horse and came into White's ; him and us generally bought hops there. I says to Darlington, ' Now Darlington, Mr. White is here and I think we are going to build, and if we build, I would like to know if you are going to take that house, or if we will take it down and haul it up to build the new house with.' ' I am going to take the house,' said he. ' Well,' said I, ' I think it would be better for us to let

[Spencer *v.* Darlington.]

you have the house than to haul up the bricks, because I would rather have the money to buy new materials than to bother with the old materials.' I told him if we would build he would get the house. I told him that emphatically, different times. * * * I remember the constable stating the terms of the sale. He put up that house for sale with a lease to run, he said, from that day about four and one-half years. * * * It was the understanding at the time we bought the malt-house at the constable's sale ; and it is the understanding yet that he is to take the house whenever it suits us to give it to him ; it was always my understanding. That was the bargain in the presence of Mr. White. I wanted to know if Darlington was still of the same mind about taking the house if we would build, or would we pull the house down and take the material up there. That was the understanding of him and me too, that he was to take the house whenever it suited us to build. That condition was put in at the time Mr. White was appealed to." * * *

The defendant's points which were refused were as follows :—

1. If the evidence in the case shows that defendants, in the month of July, A. D. 1871, purchased at the constable's sale the malt-house and lease of the premises on which it was erected, the lease running for five years from April 1st 1871, and on the same day agreed to sell the same premises to the plaintiff, and to deliver the possession thereof on the 1st day of July, A. D. 1872, that would be a parol sale within the Statute of Frauds, and the plaintiff cannot recover the value of his bargain, or the difference between what the malt-house and lease were worth at the time of the breach on the 1st day of July 1872, and what he was to pay for the same.

2. If at the time of the alleged purchase by plaintiff from defendants, he, the plaintiff, knew he was purchasing a leasehold premises, he was bound to inquire the time the lease had to run, and if the unexpired term had more than three years to run from the time he was to receive the possession of the premises, then the law visits him with notice of that fact, and his purchase is a parol purchase under the Statute of Frauds, and he is not entitled to recover the difference between the value of the premises at the time of either the making or breach of said contract of purchase and what he was to pay for the same.

3. If the jury believe that the defendants sold the plaintiff a malt-house only, and the plaintiff at the time of the sale knew that the malt-house stood on leasehold premises, and was erected and held under the leasehold title, he, the plaintiff, was bound to inquire the term and terms of the lease, and if it had an unexpired term of over three years from the time he was to get possession, then he cannot recover the difference between what it was worth

[Spencer v. Darlington.]

and what he was to give at the time of the breach of contract to deliver it.

4. If the alleged contract was for the sale of a leasehold having over three years to run from the breach of contract, with the right to remove a malt-house thereon (which belonged to the leasehold premises) at any time within the term, then the plaintiff cannot recover the difference between what the premises were worth and what he was to give, but only such loss or expenses suffered by him up to the time of the breach of the alleged contract.

The verdict was for the plaintiff for $700.

The defendants took out a writ of error, and assigned the refusal of their points for error.

*Bruce* and *Negley*, for plaintiffs in error.—The damages for breach of a parol contract for the sale of land is not to be measured by the value of the land, and a lease for more than three years is governed by the same rule: Harris v. Harris, 20 P. F. Smith 174; McClowry v. Croghan, 1 Grant 309.

*A. M. Brown*, for defendant in error.—The malt-house and fixtures were the subject of the contract lease of the lot an incident only, the lease being in fact but from year to year: McDowell v. Simpson, 3 Watts 129; Schuyler v. Leggett, 2 Cowen 663. The measure of damages was what the plaintiff could purchase a similar article for in the market: McHose v. Fulmer, 23 P. F. Smith 365; Bank of Montgomery County v. Reese, 2 Casey 143.

The opinion of the court was delivered, November 16th 1873, by

SHARSWOOD, J.—It is not controverted that under the lease from the Schenleys to Garrard & Co., the malt-house erected on the premises was personal property, and a parol contract for the sale of it not within the provision of the Statute of Frauds. It was stipulated that it might be removed at the end of the term, and was made subject to distress and sale by the lessors for rent in arrear. This action was instituted by the plaintiff below to recover damages for the non-performance—of a contract by the defendant to sell and deliver to him the malt-house. It is true that the declaration as originally filed in both counts set out an agreement for the sale of certain leasehold premises and malt-house, but an additional count was filed as an amendment, which declared upon a contract for the sale of a malt-house, with the privilege merely of using and occupying the lot of ground upon which it was erected. If there was any contract of sale at all absolute in its terms—a question submitted to the jury and found by them in favor of the plaintiff below—it was a contract by the defendants to sell what had been distrained upon for rent, and was to be sold by the constable in virtue of his warrant to distrain.

[Spencer v. Darlington.]

This was the testimony of Darlington the plaintiff, and was abundantly confirmed by the witness White, who related an interview between the plaintiff and Watson, one of the defendants, after the sale. In that conversation nothing but the malt-house was mentioned. The lessors had no authority to distrain upon the term, and they had not done so. Mr. Armstrong, the receiver of Garrard's estate, says indeed, "I think I gave Mr. Hatch (who was an agent of the Schenleys) directions to sell it by a landlord's warrant." There was no evidence that Hatch acted upon such directions. Without the sanction of the lessors it amounted to nothing. What would have been the effect upon the contract between the parties had the term been sold, it is not necessary to determine. The evidence was direct and abundant that nothing was sold by the constable but the malt-house. So the constable, called by the defendants, expressly testified. "I sold the malt-house that day. * * * I levied on the malt-house : I did not see the lease. I acted under the direction of Schenley's agent, Mr. Hatch; they directed me to sell the improvements that were on the ground, and that is what I sold; I did not sell any lease; at least I may have stated that the lease had so long to run, but it was the improvements that were on the ground that I sold." Mr. Liddell, one of the defendants, examined on their behalf, and Mr. Ray, another of their witnesses, both present at the sale, speak of the sale as of the malt-house, and say nothing of any sale of the lease. Mr. Darlington, the plaintiff, fully confirmed the constable's statement. "The constable announced what he had to sell; he said he had a malt-house seized as the property of Garrard to be sold for rent; the terms would be cash, and it would be sold to the highest bidder. He did not say it was real estate, he said he sold that malt-house; that is all I heard him say about it." Mr. Darlington stated that before the sale he had an understanding with the agent of the lessors that they would continue the lease to him if he bought, and extend it for ten years if he wished. He testified therefore: "When I was bidding, I knew I was buying a malt-house with the privilege of leasing it there or taking it away. I knew I could have it ten years if I wished it. I knew I was bidding on a malt-house and lease that had three years to run. I bought from Mr. Watson whatever they bought. He only agreed to give me the malt-house. I did not know anything about their lease." An understanding that the landlord would continue the lease was a very different thing from a sale of the term. If there was any evidence to contradict all this, it was a mere *scintilla*. Mr. Watson, one of the defendants, said : "He (the constable) put up that house for sale, with a lease to run, he said, about four and one-half years. He said he did not know the exact month or day, but it was about that time; then he said after that that it had four years to run from the next April after it was bought." Properly

[Spencer *v.* Darlington.]

considered there was nothing in this inconsistent with what the constable had testified. He admitted that he may have stated that the lease had so long to run. It was information very proper to give to the bidders. If they could arrange with the lessors and lessees, they need not remove the malt-house, but occupy it on the premises. On this state of the testimony there was no sufficient evidence to submit to the jury that anything was actually sold at the sale except what the constable had power to sell for rent. It is plain that the receipt of the constable and the assignment by Armstrong of the lease after the sale were entirely unavailing to change this result. Even if Armstrong had power to sell and assign the term, his assignment could not affect the contract of sale between the plaintiff and defendants, which we have seen related only to the malt-house. The same remark is applicable to the constable's receipt. It was not a receipt for the purchase-money, but for the rent and costs as bailiff of the landlord. It recited that the lease and premises had been sold. It is clear that he had no authority to give such a receipt. Instead of paying the whole bid to the constable, it appears that the defendants paid the balance, after deducting the rent and costs, to Armstrong, taking from him a transfer of the lease in which the amount of this balance is stated as the consideration. Armstrong was entitled to that amount from the constable if nothing but the malt-house was sold. So far as the lessors were concerned, this assignment of the lease was ineffectual to transfer it; at least it was in their power to avoid it, because it wanted the written sanction by them which the lease made necessary, and declared that in case of a transfer without such written sanction the lease and improvements should be forfeited. Whether they did afterwards sanction it does not appear, and is unimportant. That which was sold by the constable, and was the subject-matter of the contract of sale between the plaintiff and defendants below, was the malt-house, and the malt-house alone. No evidence was given of the value of the term apart from the malt-house. The truth is, as is apparent from the whole evidence, that the ground was let for its full rent, and the term independent of the improvements was therefore worthless, and it did not enter into any person's mind as of any importance as an element in the sale. It was known that the purchaser might remove the malt-house, or if he wished to occupy the premises the landlord would continue the lease.

In this view of the case the plaintiff in error has no just ground to complain of the refusal of the learned judge below to affirm his points as requested, and this refusal is all that is assigned for error. It is unnecessary, therefore, to consider what would be the effect of the Statute of Frauds in the case of a parol agreement for the sale of a term of more than three years.

Judgment affirmed.